Filed 10/14/22  P. v. Jacobs CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSUE JONATHAN JACOBS,<br><br>Defendant and Appellant. | D079892<br><br><br>(Super. Ct. No. BF161419A) |

APPEAL from a judgment of the Superior Court of Kern County, Judith K. Dulcich, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Michael Dolida and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

A jury convicted defendant Josue Jonathan Jacobs of one count of active participation in a gang (count 2) and one count of assault with force likely to cause great bodily injury (count 3) in connection with an assault that Jacobs and another prison inmate committed in a prison yard. The jury also found true a gang enhancement allegation with respect to count 3.

In his original briefing on appeal, Jacobs raises two contentions. Jacobs first contends that the trial court abused its discretion in discharging Juror No. 6 during jury deliberations. Jacobs next contends that Senate Bill No. 1393 applies retroactively to his nonfinal judgment and requires that his sentence be vacated and that the case be remanded to permit the trial court to exercise its recently granted discretion to strike or dismiss prior serious felony conviction enhancements.

After briefing was complete, Jacobs sought, and was granted, leave to file a supplemental brief. Jacobs raises three additional arguments in his supplemental briefing based on other recent legislative amendments.[1] Jacobs's additional arguments are that (1) amendments to Penal Code[2] section 186.22 apply retroactively to his case and require that his conviction for active participation in a gang be reversed and that the gang enhancement found true in connection with his conviction for assault with force likely to cause great bodily injury be vacated; (2) Senate Bill No. 567's amendments to section 1170 require that his sentence be vacated and that the case be

---

[1] Jacobs also filed a "Supplemental Reply Brief" in which he addressed the People's response to his initial supplemental brief.

[2] Further statutory references are to the Penal Code unless otherwise indicated.

2

remanded for resentencing under the new statute; and (3) Assembly Bill No. 518's amendments to section 654 require that we vacate his sentence and remand to allow the trial court to exercise recently granted discretion under that provision.

We reject Jacobs's contention that the trial court abused its discretion in discharging a juror. However, we agree with Jacobs that we must reverse his conviction on the substantive gang offense as charged in count 2, and that we must vacate the jury's true finding on the gang enhancement allegation associated with his conviction for assault as alleged in count 3, based on retroactive application of the amendments to section 186.22, enacted in Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1–5) (Assembly Bill 333), which went into effect on January 1, 2022. These amendments to section 186.22 substantially narrow the definition of a "criminal street gang" and add new elements to both the substantive gang offense and the gang enhancement that must be found true by a jury. Following remand, the People shall be afforded the opportunity to retry these allegations.

We therefore affirm Jacobs's conviction on count 3, the assault conviction, but reverse Jacobs's conviction on count 2 and vacate the jury's true finding with respect to the gang enhancement associated with count 3. The case is remanded to the trial court for further proceedings, including possible retrial if the People choose to retry the gang offense and/or enhancement. In resentencing Jacobs, whether after a retrial on those counts and enhancements that remain if the People elect not to retry the

gang offense and/or the gang enhancement, the court shall resentence Jacobs pursuant to sentencing laws in effect at the time of the resentencing.[3]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *Factual background*

Kern Valley State Prison is a level four, maximum security prison.  At the time of the relevant events, Jacobs and Joe Herrera were inmates at Kern Valley State Prison and were active members of the Surenos criminal street gang.

On April 22, 2015, B.A., a correctional officer at Kern Valley State Prison was in an observation tower monitoring a yard at Facility A of the prison.  Approximately 100 inmates were in the yard at the time.

Another inmate, Michael Lopez, who was also a Sureno, was sitting at a table in the yard by himself.  Lopez was apparently not in good standing with the gang.  B.A. observed Jacobs and Herrera approach Lopez from behind and begin to punch Lopez in the head and face.  Lopez appeared to lose consciousness, but Jacobs and Herrera continued to punch him.

J.E., a correctional officer who was working in the yard on April 22, 2015, saw Jacobs and Herrera punching Lopez in the head; J.E. used his radio to alert correctional staff that a "Code 1 emergency" was occurring.  Multiple correctional officers, including D.B., responded to the call.  J.E. and D.B. ordered all of the inmates to get down; all of the inmates complied with

---

[3]     Because Jacobs's sentence is necessarily vacated by our disposition in this appeal, we need not consider Jacobs's contentions regarding various amendments to applicable sentencing statutes.  Jacobs will eventually be resentenced, and when he is resentenced, the trial court will apply sentencing laws that are in effect at the time of the resentencing.

exception of Jacobs, Herrera, and Lopez.  Jacobs and Herrera proceeded to pull Lopez to the ground and continued hitting and kicking him.

Some of the officers at the scene threw chemical grenades toward Jacobs and Herrera to try to bring an end to the attack, but Jacobs and Herrera continued to attack Lopez.

From his perch in an observation tower, B.A. fired a warning shot toward Jacobs and Herrera.  This caused Jacobs and Herrera to stop attacking Lopez and get down on ground.  However, Lopez regained consciousness and stood up.  He appeared dazed, but started yelling at Jacobs and Herrera and staggered toward them.  Jacobs and Herrera got up from the ground and began attacking Lopez again.  Lopez fell to the ground as the attack continued.  At that point, B.A. fired a second shot toward Herrera. The bullet hit Herrera in the chest.  Herrera grabbed his chest, took a few steps, and fell to the ground.  Jacobs stepped away from Lopez and got on the ground.

Herrera died as a result of the gunshot to his chest.  An autopsy performed on Herrera disclosed the presence of two bindles in Herrera's rectum.  The bindles contained drugs, razor blades, and lead, as well as a handwritten note, which is known as a "kite," which referred to Lopez and indicated that Lopez "can not [*sic*] stay on this yard" and "[t]herefore, you camaradas will smash on him."[4]

B.     *Procedural background*

On May 26, 2016, the Kern County District Attorney filed an information charging Jacobs with the murder of Herrera, under the provocative act doctrine (§ 187; count 1); active participation in a criminal

---

4      A correctional officer testified that the term "smash" means to "batter" someone.

street gang (§ 186.22, subd. (a); count 2); and assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 3).

With respect to count 3, the information alleged that Jacobs personally inflicted great bodily injury upon the victim, Lopez (§ 12022.7, subd. (a)), and that Jacobs committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). The information further alleged as to all counts that appellant had suffered two prior serious felony convictions within the meaning of section 667, subdivisions (a)(1)) and (b)-(i), and section 1170.12, subdivisions (a)-(d).

A jury trial was held, and on May 8, 2018, the jury began deliberating. On May 15, 2018, after receiving a note from the jury indicating a question as to whether one of the jurors was following the law as instructed, the court individually interviewed multiple members of the jury, including Juror No. 6, the juror who was the subject of the jury's note. After hearing from these jurors, the court found that there was good cause to remove Juror No. 6 based on his indication that he would not follow the law as instructed. The court replaced Juror No. 6 with an alternate juror.

The following day, the jury returned guilty verdicts on counts 2 and 3, and also found true the allegation of infliction of great bodily injury and the gang enhancement. The jury was unable to reach a unanimous decision regarding the murder charge in count 1, and the trial court declared a mistrial as to that count.

After the jury returned its verdicts, the trial court held a bench trial regarding the allegations that Jacobs had suffered two prior serious felony convictions. The court made true findings with respect to these allegations.

In June 2018, the trial court sentenced Jacobs to state prison for an aggregate term of 26 years, comprised of a term of eight years for the assault

6

conviction in count 3, a term of three years for the great bodily injury enhancement and a term of ten years for the gang enhancement, plus an additional term of five years for the prior serious felony enhancement. Pursuant to section 654, the court stayed imposition of punishment with respect to count 2.

Jacobs filed a notice of appeal.

III.

DISCUSSION

A. *The trial court did not abuse its discretion in excusing Juror No. 6*

Jacobs contends that the trial court abused its discretion when it excused Juror No. 6 from the jury panel during deliberations and replaced him with an alternate juror after concluding that Juror No. 6 would not follow the law as instructed.

1. *Additional background*

Jacobs was charged with murder under the provocative act doctrine, under the theory that B.A. shot and killed Herrera after Jacobs and Herrera attacked Lopez in the prison yard. " 'A provocative act murder case necessarily involves at least three people – . . . the perpetrator of the underlying offense, an accomplice, and a victim of their crime.' [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654 (*Gonzalez*).) "[T]he provocative act doctrine holds the perpetrator of a violent crime vicariously liable for the killing of an accomplice by a third party, usually the intended victim or a police officer. [Citations.]" (*Ibid.*) "Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and [a third party] kills in reasonable response to that act, the perpetrator is guilty of murder. [Citations.] 'In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional

act of the defendant or his accomplice committed with conscious disregard for life.' " (*Id.* at p. 655.)

In order for a jury to find a defendant guilty under the provocative act doctrine, there must be "proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Gonzalez, supra*, 54 Cal.4th at p. 655.) "Malice will be implied if the defendant commits a provocative act knowing that this conduct endangers human life and acts with conscious disregard of the danger." (*Ibid.*)

The trial court instructed the jury in this case with a modified version of CALCRIM No. 560, the instruction regarding the provocative act doctrine, as follows:

> "The defendant is charged in Count 3 with assault with force likely to produce great bodily injury.
>
> "The defendant is also charged in Count 1 with murder. A person can be guilty of murder under the provocative act doctrine even if someone else did the actual killing.
>
> "To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that:
>
> "1. In committing assault with force likely to produce great bodily injury, the defendant intentionally did a provocative act;
>
> "2. The defendant knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life;
>
> "3. In response to the defendant's provocative act, Officer [B.A.] killed Jose Herrera;

8

"AND

"4. Jose Herrera's death was the natural and probable consequence of the defendant's provocative act.

"A provocative act is an act that goes beyond what is necessary to accomplish the assault with force likely to produce great bodily injury and whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response.

"In order to prove that Jose Herrera's death was the natural and probable consequence of the defendant's provocative act, the People must prove that:

"1. A reasonable person in the defendant's position would have foreseen that there was a high probability that his or her act could begin a chain of events resulting in someone's death;

"2. The defendant's act was a direct and substantial factor in causing Jose Herrera's death;

"AND

"3. Jose Herrera's death would not have happened if the defendant had not committed the provocative act.

"A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death. If you decide the defendant committed murder, that crime is murder in the second degree."

During deliberations, the jury sent two notes to the court regarding the CALCRIM No. 560 instruction and the provocative act doctrine. The first note, sent by the jury on May 10, 2018, stated:

9

"In the jury instructions under the header 560, there are seemingly different definitions regarding the provocative act doctrine that we would like clarification on.

"Under the definition, #2 states that there must be a high probability that the act will provoke a deadly response.

"Whereas, under the area at the bottom of the same page (#1) states that 'his or her act could begin a chain of events resulting in someone's death.'

"Is the qualifier could or will when referring to foreseeing a deadly response?"

In responding to the jury's May 10 note, the trial court told the jurors, "Th[e] phrase [referenced in the second paragraph of the note] is part of the definition of the term 'provocative act' and should be considered in defining that term, along with the rest of the definition."  With respect to the third paragraph of the jury's note, the court stated, "[T]his phrase is part of the definition of the term natural and probable consequences and should be considered in defining that term along with the rest of the definition."

Four days later, the jury sent another note to the court:

"Could you please clarify the definition of a reasonable person in the defendant's position?  Would the defendant's position be defined as a Southern Hispanic inmate at a Level 4 facility (i.e. Kern Valley State Prison)?

"The trial court answered the jury's May 14 note as follows:

"Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.

"The issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident.

10

"The issue does not turn on the defendant's subjective state of mind, but depends on whether, under all the circumstances presented a reasonable person in the defendant's position would have or should have known that there was a high probability that his or her act could begin a chain of events resulting in someone's death."

On May 15, 2018, the jury informed the trial court that it had "thoroughly discussed and considered all the evidence and [could not] reach a unanimous decision on any of the counts."

The trial court called the jurors into the courtroom and instructed them with a modified version of CALCRIM No. 3551:

> "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. Please consider the following suggestions:

> "Do not hesitate to re-examine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views.

> "Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors.

> "It is your duty as jurors to deliberate with the goal of reaching a verdict, if you can do so, without surrendering your individual judgment.

> "Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict.

> "Both the People and the defendant are entitled to the individual judgment of each juror.

11

"It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective.

"Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. I can also offer additional closing argument from the attorneys if there was a narrowed-down particular area. If you need additional testimony -- I should have told you this in the beginning. You can narrow it to an area. So if there is a particular area you remember a witness testifying about, the reporter is able to search for that, and you can have only that portion read back. You do not have to have an entire witness['s testimony read back]."

Less than an hour after the trial court provided this instruction, the jury sent another note:

"We would like to formally request an alternate juror because there is a juror who refuses to follow the law or does not fully understand law regarding the provocative act doctrine."

The trial court brought the jury foreperson into the courtroom to inquire about the situation. The court asked the foreperson why he believed that a juror was not following the law. The foreperson responded, "Well, because he told us." When the court asked the foreperson to explain what he meant by that statement, the following exchange occurred:

"THE FOREPERSON: What he said is, and he said it in his preinterview before he became a juror, he asked for clarification on the law, and he was told the judge would give that to him eventually, and he feels he's never gotten the full explanation of the law. He doesn't think the jury instructions are detailed enough of the Provocative Act Law for him to really fully understand it; so it could just be that he doesn't think he understands it completely, but the

12

consensus among the jurors, they think he just doesn't like it.

"THE COURT: Okay. Has he said anything along those line[s], that I disagree with that, or I can't follow that?

"THE FOREPERSON: He says, in my understanding from the jury instructions, I'm not sure I understand the law, but if the law applies this way, then I can only vote this way."

The court asked whether there was "anyone else on the jury," other than Juror No. 6, with whom the court should speak. In response, the foreperson suggested that the trial court speak with Juror No. 3, and the court called that juror into the courtroom. The court asked Juror No. 3 whether the juror shared the opinion expressed in the note that a member of the jury was "refusing to follow the law or does not fully understand the law." Juror No. 3 responded, "Yes," and when asked for an explanation, he said, "The instructions are very clear for each count, and there is -- each count references a law, and [Juror No. 6] is trying to base one law based on all three counts; so there is a sense that he might not be taking it seriously or that he is not applying [the law] the way he should be applying [it]." Juror No. 3 further indicated that Juror No. 6 "kind of switched sides back and forth," and his conduct gave Juror No. 3 a sense that Juror No. 6 was not taking the deliberations "seriously." Juror No. 3 also stated that most of the other jurors agreed with Juror No. 3's impression in this respect.

Based on Juror No. 3's suggestion that the court speak with Juror No. 9, the trial court called Juror No. 9 into the courtroom. After the court asked Juror No. 9 whether he shared the view indicated in the jury's note, the court and Juror No. 9 engaged in the following colloquy:

13

"JUROR [NO.] 9: I mean, to an extent, I understand where they are kind of caught between it, but I do feel like it is kind of hindering us from being able to make progress due to them not feeling like they understand what it means.[5]

"THE COURT: Do you think it is not understanding the law, or do you think it is not liking the law and refusing to follow it?

"JUROR [NO.] 9: I feel like it is a little bit of both, but I think it is more of, like, personally not being able to follow it, and their justification is that they don't understand it, but that is kind of just what I'm getting out of it."

The trial court then called Juror No. 6 into the courtroom to discuss the matter. The court and Juror No. 6 engaged in the following exchange:

"THE COURT: Okay. So let me ask you a few questions. [The jury note] gives two different scenarios. One is that you refuse to follow the law or that you do not fully understand the law. [¶] Which do you think it is, or is it both?

"JUROR [NO.] 6: I hope it is I don't understand the law, but I really don't understand the law, and I tried to make that clear when the law was first presented to me.

"THE COURT: Okay. And have you discussed the jury instruction that defines the law with the other jurors?

"JUROR [NO.] 6: Oh, yeah.

"THE COURT: Okay. Is there any part of it that you feel I just can't agree with this, and I just -- if that is what it means, I can't do this?

"JUROR [NO.] 6: Well, I mean, I was being asked how I felt about the law before I was selected. I gave a scenario of

_____

5    Although Juror No. 9 referred to "they" and "them," the court and the attorneys later clarified that Juror No. 9 was speaking of Juror No. 6, only.

14

what I thought it meant, and I was told -- well, I wasn't told no, that is it, but I was given another story, and that didn't help, and it sounds like, to me, that -- this person is committing a crime. This person over here has an action, and now this person is responsible for a crime that they would never commit.

"I have -- that is not logical to me; so maybe it is the law itself, if that is what the law says. If we carry that line of reasoning, anyone that is forced into a situation or -- you know, they are not guilty because it is the person that forced them into it, the person that pushed their hand.

"In this particular case, the act that is taking place has almost the same consequence as far as the law -- I don't know the law, but I would assume. It has almost the same consequence under the law as the imaginary crime.

"THE COURT: When you say imaginary crime, what are you referring to?

"JUROR [NO.] 6: Well, one person shot a person. That is not necessarily a crime. It is his job under what he saw. And he understood he felt it was necessary; so he shot a person. Now, a little bit of what we have to determine is what is going on in the other person's mind,[6] but the other person has no intent of harming that person, and he is harming another person possibly, but we don't know his intent. It just -- it makes my mind spongy.

"THE COURT: So when you first started talking about what you thought the understanding of the law was, if that was the law and you were told that is the law, would you be able to follow it?

"JUROR [NO.] 6: If the law says that without any intent or malice or action, this person can be accused of a crime

6       At a later point in the transcript, the trial court stated that Juror No. 6 was motioning "towards the defendant" when he was discussing having "to determine what is in this person's mind."

15

when this person provided the action. This person has no intent to hurt that person. This person has nothing against that person. In fact, they are partners. They are working together. If he has nothing against him, and this guy sho[o]ts him, how can he be responsible? I can't comprehend it.

"THE COURT: So if you were told that that is the law --

"JUROR [NO.] 6: I have little respect for that law.

"THE COURT: *But would you be able to follow it?*

"JUROR [NO.] 6: *No.*

"THE COURT: Is there anything else that you can tell us about your issue as to whether you think it is confusion or you think it is lack of respect for the law, so a decision not to follow the law?'

"JUROR [NO.] 6: I have great respect for the law. I stop at stop signs in the middle of the night when there is nobody around. I have never had anything more than a traffic ticket, and I haven't had a traffic ticket in probably over 20 years.

"I think if the question could have been asked specifically before the trial began when I explained that I didn't understand and I was told that I would understand later, I think it would have been a good time to decide I wouldn't be a good juror. That is far away from me. I understand. But I have been very frustrated, and I have tried very hard and so has everybody else in there. Those are wonderful people. You couldn't have picked a better jury except for me.

"THE COURT: So do you feel that you -- and not everybody agrees with every law, but like you said, people follow the law. Do you feel like, in your heart, you do understand what the instruction is telling you as to what the law is, but you just can't agree with that; so you can't follow it?

16

"JUROR [NO.] 6: You would probably understand that better than I would, because I haven't seen the law. From -- as I understand it, *it doesn't fit with some extremely basic building blocks of my personality. I can't go there.*

"THE COURT: Because of how you feel about what --

"JUROR [NO.] 6: As I understand it, if I understand it, yes. I'm not going to say I couldn't be schooled, and if I did understand it, maybe I have got it all wrong. From what I have said in here, you have a better idea of that than I do.

"THE COURT: Are you saying if your understanding to this point is correct, that you would not be able to follow that?

"JUROR [NO.] 6: No.[7]

"THE COURT: All right. I'm going to let you go back and join the other jurors, and then we will get back to you as a group." (Italics added.)

After hearing argument from the attorneys, the court determined that good cause existed to remove Juror No. 6 on the ground that he was unwilling to follow the law, as opposed to having a lack of understanding the law. The court explained its reasoning:

"So I think what I asked him was if that is the law, would you be able to follow it? Because he gave a pretty good description, if you will, of the acts leading up to this provocative act murder. He also did talk about and then we have to determine what is in this person's mind and he was motioning towards the defendant, and so it is clear -- I

---

7    Although Juror No. 6 stated "No" in response to the court's question, "Are you saying if your understanding to this point is correct, that you would not be able to follow that," it is clear from the context of the discussion that Juror No. 6 was indicating that he *would not* be able to follow the law as he understood it, and was *not* indicating that he *would* be able to follow the law as he understood it.

think . . . it is clear he has an understanding of provocative act murder and that he just morally is having issues with that and can't follow that once he gets to the point of that is the law. *And juror misconduct doesn't just include refusal to deliberate. It includes refusal to follow the law.* That was my main concern when I saw this note was that phrase, refuses to follow the law, and I wanted to find out if it was a refusal to follow the law or if it was a non-understanding.

"The other jurors indicated he's gone back and forth, and one of them indicated they feel like it is refusing to follow that law, then being couched in terms of being confused, which I heard him, and I think in looking at him and hearing what he is saying, when he gets to that point of understanding what the law is, he just can't believe that that is the law, and so if that is the law, which is set forth in the jury instructions -- and I think he has a good grasp of it, because he did not only give us that scenario of what he thought was involved, but he also talked about then looking into the defendant's mind, and we have had many discussions about how the defendant's mind is --his state of mind [and] the foreseeability of this are very important in this case as well.

"So based on what I am finding to be a refusal to follow the law as given, I am going to find good cause to excuse him from the jury and seat an alternate.

2.    *Analysis*

Penal Code section 1089 grants a trial court authority to discharge a juror, providing in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown to the court is found to be unable to perform his or her duty*, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the

18

same rules and regulations as though the alternate juror had been selected as one of the original jurors."

"A juror who 'refuses to follow the court's instructions is "unable to perform his duty" within the meaning of Penal Code section 1089.' " (*People v. Salinas-Jacobo* (2019) 33 Cal.App.5th 760, 775.)

"Although [a] court reviews for abuse of discretion a [trial] court's ruling discharging a juror pursuant to section 1089 [citation], we have made clear that such review involves a 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' [Citations.] Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.' [Citations.]" (*People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*).)

"Under the demonstrable reality standard, a reviewing court's task is more 'than simply determining whether any substantial evidence in the record supports the trial court's decision.' [Citation.] 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact could have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not reweigh the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial

19

court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.' [Citation.]" (*Armstrong, supra*, 1 Cal.5th at pp. 450-451.)

Applying this heightened standard of review, we conclude that the trial court did not abuse its discretion in discharging Juror No. 6 because Juror No. 6's inability to perform his duty as a juror appears in the record as a demonstrable reality. Juror No. 6's statements to the court demonstrated that Juror No. 6 understood the provocative act doctrine, that he disagreed with the law, and that he was unwilling to apply the law as instructed. Juror No. 6 not only accurately described the provocative act doctrine, but also demonstrated his understanding of its application to the facts of this case. Under questioning from the court, Juror No. 6 explained that B.A. shot Herrera because B.A. thought it was necessary to do so to stop the attack on Lopez, and noted that "[i]t [was] [B.A.'s] job under what he saw." Juror No. 6 then said that the jury had to determine "what [wa]s going on in [Jacobs's] mind" at that time. Juror No. 6 proceeded to describe his understanding of the provocative act doctrine, stating, "This person [Jacobs] has no intent to hurt [his accomplice, Herrera]. [Jacobs] has nothing against [Herrera]. In fact, they are partners. They are working together. If [Jacobs] has nothing against [Herrera], and [B.A.] sho[o]ts [Herrera], how can [Jacobs] be responsible? I can't comprehend it." Based on Juror No. 6's description of the facts and his demonstrated understanding of the court's instruction regarding the provocative act doctrine, the court correctly concluded that Juror No. 6 "ha[d] a good grasp of it, because he did not only give us that scenario of what he thought was involved, but he also talked about then looking into [Jacobs's] mind, and we have had many discussions about how [Jacobs's] mind is --his

20

state of mind, the foreseeability of this are very important in this case as well."

Further, when the trial court specifically asked Juror No. 6 whether he could still follow the law, despite not agreeing with it, Juror No. 6 informed the court that he would *not* follow the law:

> "THE COURT: So if you were told that that is the law [i.e., what Juror No. 6 had just correctly described] --
>
> "JUROR [NO.] 6: I have little respect for that law.
>
> "THE COURT: *But would you be able to follow it?*
>
> "JUROR [NO.] 6: *No.*" (Italics added.)

Juror No. 6 did not stop there. He explained further: "[A]s I understand [the law], it doesn't fit with some extremely basic building blocks of my personality. I can't go there." He then acknowledged that "if [his] understanding to this point is correct," he would not "be able to follow that."

In view of Juror No. 6's clear indication to the trial court that he would not be able to perform his duty of applying the provocative act doctrine as instructed by the court, the court had an adequate basis to dismiss Juror No. 6 for good cause.

B.   *Jacobs's conviction on count 2 must be reversed and his gang enhancement vacated*

   1.   *Additional background*

The People called a gang expert who testified that Jacobs and Herrera were both active members of the Surenos at the time of the assault on Lopez. However, Jacobs was not "validated" as a gang member by relevant authorities until after the incident. The expert further testified that Lopez

was also a Sureno, but that he was not in good standing with the gang at the time the assault occurred.

The People presented evidence of two "predicate" offenses to demonstrate a pattern of gang activity. One offense occurred in December 18, 2013, when two inmates at Kern Valley State Prison, Michael Bohen and Lopez, the victim of the attack by Jacobs and Herrera that led to the current charges, attacked a third inmate, G.D. Lopez used a weapon during the attack. The People presented evidence that all three inmates were Surenos gang members. Although Bohen and Lopez were charged in connection with the attack on G.D., no gang charges were brought against either man.

The People also presented evidence about another attack that occurred on or around April 16, 2013. This attacked was perpetrated by two other Kern Valley State Prison inmates, Manuel Ocampo and Daniel Cowie, against a third inmate, J.C. The gang expert testified that all three of the inmates involved in this attack were also Surenos, and that J.C. was also a "validated Mexican Mafia associate."[8] Ocampo and Cowie pleaded guilty to committing assault with force likely to produce great bodily injury. The People did not file gang charges or allegations against either man in that case.

2. *Relevant law*

Effective January 1, 2022, Assembly Bill No. 333 amended section 186.22 in several ways that increased the evidentiary burden necessary to prove a substantive gang offense under section 186.22, subdivision (a), as

_____

[8]     The gang expert testified that a "validated Mexican Mafia associate" is "a Sureno who, through our validation system, there was enough evidence to show their active participation with the Mexican Mafia."

22

well as a gang enhancement under section 186.22, subdivision (b)(1). *(See People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822.)

Assembly Bill No. 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).) When Jacobs was tried, former section 186.22 defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons . . . whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f).) Assembly Bill No. 333 narrowed the definition to "an ongoing, organized association or group of three or more persons . . . whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) This change requires that the People "prove that two or more gang members committed each predicate offense." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1072; accord, *Lopez*, at pp. 344–345.)

In addition, under the former version of section 186.22, the phrase " 'pattern of criminal gang activity' " was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [specified] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e).) Assembly Bill No. 333 changed this definition; under the new definition of " 'pattern of gang activity,' " the predicate offenses must have been committed by two or more "members" of the gang (as opposed to two or more *persons*) and must have "*commonly* benefited a criminal street gang"; further, "the common benefit of

23

the offense [must be] *more than reputational.*" (§ 186.22, subd. (e)(1), italics added.)[9]  In addition, the currently charged offense may no longer be considered as a predicate offense.  (§ 186.22, subd. (e)(2).)  The new law also reduced the number of qualifying offenses that may be used to establish a pattern of criminal gang activity by removing, among other offenses, vandalism, looting and several fraud-related offenses from the list.  (§ 186.22, subd. (e)(1)(A)-(Z).)

Assembly Bill No. 333 also added section 1109, which requires bifurcation of substantive gang offenses from other substantive offenses that do not require gang evidence as elements of the offense (*id.*, subd. (b)), and also requires that gang enhancements charged under section 186.22, subdivision (b) or (d) be tried separately from the underlying charges upon request by the defense (*id.*, subd. (a)).  (Stats. 2021, ch. 699, § 5.)

3.  *Analysis*

Jacobs and the People agree that Assembly Bill No. 333's amendments to section 186.22 apply retroactively to nonfinal judgments under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 and its progeny.  We accept the People's concession and conclude that the recent changes to section 186.22 apply to Jacobs's case.  (See, e.g., *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 819; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087; *Lopez, supra*, 73 Cal.App.5th at p. 344.)

---

[9]     Under section 186.22, subdivision (g), "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

Jacobs contends that because the changes to section 186.22 apply to nonfinal judgments, his conviction for a substantive gang offense in count 2 must be reversed and the jury's true finding on the gang enhancement alleged in connection with the assault conviction in count 3 must be vacated. According to Jacobs, the failure of the trial court to instruct the jury with respect to the elements added to section 186.22 by Assembly Bill No. 333 requires remand. Jacobs asserts that "[a]lthough the prosecution did submit evidence of two non-current predicate offenses . . . , that evidence did not establish that the predicate offenses commonly benefited a criminal street gang, let alone that the benefit was more than reputational," as is required under the current version of section 186.22, subdivision (e)(1). Jacobs also points out that while the People presented evidence of two potential predicate offenses apart from the charged offense, the jury was instructed, as was permissible under the prior version of the law, that it could rely on the charged offense as one of the predicate offenses for purposes of determining whether a pattern of criminal gang activity had been proven.[10] In addition, the prosecutor specifically argued this point to the jury in closing argument, telling jurors "Now, assuming you find this defendant guilty of the 245 on Michael Lopez, you can use this as a predicate . . . ."[11]

---

[10] Jacobs notes that the jury was instructed as follows: "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved."

[11] The prosecutor also told the jury that "[t]he predicates do not have to be gang related," and that the People were not required to prove that the perpetrators of the predicates were gang members. Neither of these statements remains true under current law. (See § 186.22, subd. (e)(1).)

According to the People, remand for retrial on the gang charge and the gang enhancement is unnecessary "because, in light of compelling evidence supporting the gang-related offense and enhancement, it is beyond a reasonable doubt that the jury would have found the substantive gang offense and enhancement to be true even under AB 333's more stringent new requirements."[12] The People argue that Jacobs is "not entitled to any remand because the two predicate assaults admitted into evidence (Lopez/Bohen and Ocampo/Cowie) were indisputably shown to have been gang-related and perpetrated by gang members." Thus, the People contend, there was "overwhelming evidence" supporting a finding that the predicate offenses meet the new requirements of section 186.22, and that therefore the prejudice standard articulated in *Chapman* is met. We disagree.

It is clear that the jury was not instructed to find that the predicate gang offenses "commonly benefited" the gang, much less that any common benefit was something beyond merely a reputational benefit. The People suggest that despite the lack of such a finding by the jury, we can conclude beyond a reasonable doubt that the jury would have made such findings because, the People assert, "[a]ssaults like [the ones supplying the predicate

---

[12] The People concede, and we agree, that when jury instructions are deficient for omitting an element of an offense, the omission implicates a defendant's federal constitutional rights, and therefore, such error is reviewed for prejudice under the prejudice standard articulated in *Chapman v. California (1967) 386 U.S. 18 (Chapman)*. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 668 (*Sek*) [applying Chapman standard to omission of elements of gang enhancement added pursuant to Assem. Bill No. 333].) Under the *Chapman* standard for prejudice review, the absence of jury instructions addressing the substantive changes to section 186.22 requires reversal unless "it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict." (*People v. Flood* (1998) 18 Cal.4th 470, 504.)

offenses] benefitted the Surenos and the Mexican Mafia and allow these gang associations to control the prison and jail populations through fear and intimidation." Unfortunately for the People, the record does not support this assertion. The record citations on which the People rely in support of this claim do not indicate that there was testimony linking the two predicate assaults to a common benefit for the Surenos or Mexican Mafia gangs. Instead, one record citation is to a portion of the transcript in which a witness admits that there were no gang charges alleged against any of the perpetrators of the predicate assaults; other record citations are to testimony from a former Mexican Mafia gang member. Included in the testimony cited by the People is this former member's testimony that "someone [would] want to put in work on behalf of the Mexican Mafia" in order "to gain attention of the members as possible membership in the future or to be in good standing[ ] with them." The People also cite to a transcript page where the former member stated that "the Mexican Mafia control[s] Southern Hispanic California inmates within the prisons" "[t]hrough fear and intimidation," and further explained that he "would have to get permission from [a Mexican Mafia member]" to do things, and that, without permission, "[one] could be killed for not following the rules." Finally, the People cite to the former gang member's testimony to the effect that, even though the Surenos have greater numbers, the Mexican Mafia members are in charge and the Surenos do not rebel against the Mexican Mafia because of the "fear and intimidation and the mystique of the Eme [i.e., Mexican Mafia] has [*sic*] in these men that stops them from doing that"; the "Eme has a mystique of being all powerful and having people everywhere, you know, and having things done whenever they want and people believe that; so that drives them to have fear of the Eme." However, the former gang member does not discuss the predicate

27

offenses in the testimony cited, and neither he nor the agent who testified about the predicate offenses provided a link between the two assaults charged as predicate offenses and a common benefit to the gang of "allow[ing] these gang associations to control the prison and jail populations through fear and intimidation," as the People suggest.

Rather, the record is effectively silent regarding the possible reasons for the Lopez/Bohen assault on G.D. and the Ocampo/Cowie assault on J.C., and there was no expert opinion provided to the effect that assaults such as these identified predicate offenses would have been undertaken for a common gang benefit that went beyond a reputational benefit. Given that in both situations the victims and the perpetrators were all members of the same gang, there could have been any number of reasons for the assaults, including personal, as opposed to gang, vendettas. The People's suggestion that the evidence in the record can support the conclusion the People offer about how these predicate offenses may have commonly benefitted the gang is effectively a request that this court engage in factfinding and make a determination that should be left to a jury. We decline to do so. In the absence of any evidence that these assaults "commonly benefited" Jacobs's gang, much less evidence that the common benefit to the gang was more than reputational, we have no basis for concluding that a jury would have found that these predicate offenses satisfy the definition of " 'pattern of criminal gang activity' " under the current version of section 186.22, subdivision (e)(1).

We therefore cannot conclude beyond a reasonable doubt that if the jury had been properly instructed on the law as it currently stands it would have found Jacobs guilty of the substantive gang offense charged in count 2, or that it would have found true the gang enhancement alleged in connection with the assault charged in count 3. Jacobs's conviction on count 2 for active

28

participation in a gang must therefore be reversed, and the jury's true finding on the gang enhancement alleged in connection with charge 3 must be vacated.[13]

The People contend that if we conclude that reversal of the gang offense and vacatur of the gang enhancement are appropriate, then it would also be appropriate to remand the matter to provide the prosecution an opportunity to prove the gang offense and gang enhancement under the newly amended version of section 186.22. We agree. As the court in *Sek* explained, " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial. [Citations.] " 'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' [Citation.]" [Citations.]' " (*Sek, supra*, 74 Cal.App.5th at pp. 669-670; see *Lopez, supra*, 73 Cal.App.5th at p. 346 ["the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22"].) We agree with this analysis and conclude that on remand, the prosecution may elect to retry Jacobs on the gang offense and gang enhancement.

---

[13] As we have previously noted, because we are reversing Jacobs's conviction in count 2 and vacating the jury's true finding regarding the gang enhancement alleged with respect to count 3, there is no need to address Jacobs's claims regarding the application of amendments to various sentencing statutes. This case will be remanded for further proceedings, including resentencing, and the trial court will apply sentencing law that is in effect at that point in time.

On remand, trial court shall resentence Jacobs, either after retrial if the People elect to retry the gang offense and/or the gang enhancement, or with respect to count 3 if the People elect not to retry the gang offense and enhancement. The court shall apply all sentencing provisions and exercise its discretion as allowed by sentencing law in effect at the time resentencing occurs.[14]

IV.

DISPOSITION

Jacobs's conviction on count 3 is affirmed. Jacobs's conviction on count 2 is reversed, and the jury's true finding with respect to the gang enhancement alleged in connection with count 3 is vacated. The case is remanded to the trial court for further proceedings consistent with this opinion.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

---

[14] On remand, "the resentencing court has jurisdiction to modify *every* aspect of the sentence, and not just the portion" that was the basis of the resentencing hearing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) "This rule is justified because an aggregate prison term is not a series of separate independent terms, but one term made up of interdependent components. The invalidity of one component infects the entire scheme." (*People v. Hill* (1986) 185 Cal.App.3d 831, 834.) The only restriction on the trial court is that the new sentence must be no more severe than the original one. (*People v. Hanson* (2000) 23 Cal.4th 355, 358–360.)